## No. 12,877.

## STATE OF LOUISIANA VS. AMERICAN SUGAR REFINING COMPANY.

### SYLLABUS.

The words and terms of a constitutional article, like those of a statute, are to be construed and understood in their most usual signification; and an exemption from taxes or licenses must receive a strict interpretation.

If no precise exemption can be pointed out as applicable to that claimed, the demand will be disallowed.

#### ON REHEARING.

The proof disclosing that a business corporation purchases from planters and other sources, a large supply of sugar in a completely manufactured state, and, by skillful manipulations, through the instrumentality of vast, elaborate and complicated machinery, and an application thereto of steam-

power and great air pressure, same is first melted, then cleansed of its impurities, then bleached and improved in color, and then dried, granulated and brought into sugar again—in exactly the same state it was when these manipulations were commenced, though greatly improved in purity and beauty of appearance, and rendered more merchantable—it is not a manufacturer in the sense of article two hundred and six of the Constitution of 1879, which exempts manufacturers from license taxation.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Monroe, J.*

*E. H. McCaleb, Jr.,* for Plaintiff and Appellant.

*Thomas J. Semmes* for Defendant and Appellee.

Argued and submitted December 6, 1898.
Opinion handed down December 19, 1898.
Rehearing granted January 9, 1899.
Submitted on briefs February 10, 1899.
Opinion handed down March 7, 1899.

The opinion of the court was delivered by

WATKINS, J.    This is a proceeding by rule on the part of the State Tax Collector of the Second District of the City of New Orleans, against the defendant, for the sum of twenty-one thousand dollars, as the aggregate amount of licenses due the State for the years 1892, 1893, 1894, 1895, 1896 and 1897, upon which interest and attorney's fees are to be computed according to law.

It is alleged, that the defendant is conducting the business of refining sugar and molasses, and has been conducting said business during the various years aforesaid, without having obtained any license therefor from the State; and that the annual gross receipts of said defendant company is in excess of two million five hundred thousand dollars.

It is further alleged that all persons who conduct any business without obtaining a license from the State before the first day of March, are declared delinquents, and become liable to interest and penalties; and that the defendant having been a delinquent in each of the aforesaid years, is liable for said licenses, interest and attorney's fees.

To the rule taken, the respondent excepted, that the tax collector had no authority to thus proceed, it never having been placed on the list

of delinquent license payers, which the law requires him to furnish.

Reserving the benefit of said exception, it makes the following answer, viz.:

That the business of refining sugar and molasses is exempt from the payment of a license tax for the years specified, because its said business is and always has been that of refining sugar and molasses, and none other, and as such, it is and always has been, one of those manufacturers enumerated in Article 207 of the Constitution, as entitled to exemption from license taxes, etc."

Its further answer is, that Act 150 of 1890, on the authority of which the license sought to be collected is demanded, violates the Constitution of the United States, and is void, in so far as it attempts to impose a license tax upon defendant company because the said act denies to it the equal protection of the laws of the State, inasmuch as said act does not impose equally a license tax on all persons engaged in the business of refining sugar and molasses; but, on the contrary, discriminates in favor of planters who refine their own sugar and molasses, and in favor of planters who granulate syrups for other planters during the rolling season.

That for the foregoing reasons, said act conflicts with, and is violative of the provisions of the fourteenth amendment of the Constitution of the United States, which prohibits any State from depriving a person of his property without due process of law, and from denying any person within its jurisdiction the equal protection of the laws.

On the trial of the exception, same was overruled, and on the trial of the rule same was discharged; and from that judgment, plaintiff in rule prosecutes this appeal.

I.

The exception suggests, that it is a condition precedent to proceedings by rule to collect delinquent licenses as contemplated by Act 150 of 1890, that the tax collector shall first enter the names of all delinquents upon the tax register; and shall, also, include the names of such delinquents in a list to be furnished to the attorney of the tax collector.

In our opinion, that supposition is not supported by the terms of the statute cited.

Instead of the entry upon a license register being a condition prece-

dent to a proceeding by rule, it clearly appears from section twenty of the act, that the tax collector is required to keep a license register of every person, with the trade, profession, etc., pursued, the class and graduation of the same, and the amount of the license applied for.

Instead of that provision having any relation to *delinquent* licenses, it plainly specified the purpose of the legislature to have been to require tax-collectors to prepare and keep a book in which they shall record the statements of all persons, *"who may apply* for licenses to pursue any trade, profession, vocation, or selling, etc."   Certainly it can have no application to those persons who, like defendant, made no application at all.   Section twenty-two of the act has exclusive reference to collected and not delinquent licenses.

The exception was properly overruled.

## II.

We will take the last proposition of the defendant first.   The contention of counsel is, that Act 150 of 1890, exempts planters who refine their own sugar, from the payment of a license, and imposes a license upon persons who, like defendant, are exclusively engaged in refining sugars—thus depriving them of the equal protection of the laws, in violation of the fourteenth amendment of the Constitution of the United States.   On the other hand, the contention of the tax collector's attorney is, that the sugar planter who produces as well as refines his own sugar, belongs to a wholly different class from that to which the *refiner* who *purchases manufactured sugar,* and thereafter refines it and sells it upon the market, after same has been refined, belongs.

That the planter is the real manufacturer of sugar, and the refining process carried on by him is merely one of cleansing and purifying it, and better fitting same for market, and only incidentally connected with his occupation of manufacturer; whilst, on the other hand, the business of the defendant is exclusively that of refining sugar—an independent business.

Consequently, there can be no discrimination imputed to the statute, in favor of one and against another of the *same* class.

That the act clearly specifies two distinct and different classes, one of whom purchases, refines and sells sugar, and the other of whom

manufactures and refines his own product—the two classes of persons being dissimilarly situated.

The exemption clause of the statute is couched in the following terms, viz.:

"*Provided* nothing herein shall be construed to apply to the business of grinding meal, ginning cotton, or making sugar by any farmer or planter."

*Proviso* to paragraph 1, of Act 150 of 1890—under the heading of "manufacturers"—same being the general license law. .

The objection to the foregoing provision of the statute appears to be, that it is special in its character, and such legislation was held by the Supreme Court not to come within the provisions of the fourteenth amendment.

They say: "The objection that the law of 1874 deprives the railroad companies of the equal protection of the laws, is even less tenable than the one considered. It seems to rest upon the theory that legislation which is special in character is necessarily within the constitutional inhibition; but nothing can be further from the fact. The greater part of all legislation is special, either in the subjects sought to be attained by it, or in the extent of its application."

After analysing the statute, the court made the observation, viz.:

"Such legislation is not obnoxious to the last clause of the Fourteenth Amendment *if all persons subject to it are treated alike under similar circumstances and conditions in respect to both of the privileges conferred and the liabilities imposed.*"

Missouri Railway Co. vs. Hackey, 127 U. S. 305.

The same rule of interpretation was announced in Santa Clara County vs. Railroad Company, 118 U. S. 394; Milling Company vs. Pennsylvania, 125 U. S. 187; Wurtes vs. Holland, 114 U. S. 606; Railroad Company vs. Richmond, 96 U. S. 321.

The statute in question exempts alike all planters and farmers who are engaged in "making sugar," and makes no mention of those persons who are engaged in the business of refining sugar and molasses.

A very clear case is thus stated by the Supreme Court in Pacific Express Company vs. Seebert, 142 U. S. 339, in which Mr. Justice Lamar, speaking for the court, said:

"The legislation in question cannot be considered as invidiously discriminating against the express companies defined by it in favor of other companies or persons that may carry express matter on cer-

tain other conditions, or under different circumstances. There is an essential difference between express companies defined by this act, and railroad and steamboat companies, or other companies that own their own means of transportation.

"The vital question is this: Railroad companies pay taxes on their road-beds, rolling stock, and other tangible property, etc. * * *

"This distinction clearly places express companies defined by this act *in a separate class from companies owning their own means of transportation.* They do not do business under the same conditions, or, under similar circumstances. In the nature of things, and irrespective of the definitive legislation in question, they belong to different classes. There can be no objection, therefore, to the discrimination made as between express companies defined by this act, and other companies or *persons incidentally doing a similar business by different means and methods,* in the manner in which they are taxed."

In our conception, that decision is exactly applicable to this case, and puts the constitutionality of the act in question beyond doubt.

We think the judge *a quo* correctly overruled the defendant's exception and maintained the constitutionality of the statute.

## II.

Is the defendant a manufacturer in the sense and within the meaning of Article 207 of the Constitution of 1879, and entitled to exemption?

The language of that article is, "that there shall also be exempt from taxation and license * * * the capital and machinery and other property employed in the manufacture of textile fabrics, leather, shoes, harness, saddlery, hats, flour, machinery, agricultural implements, and furniture and other articles of wood, marble, or stone; soap, stationery, ink and paper, boat building and chocolate; *provided,* not less than five hands are employed in any one factory."

By a constitutional amendment, that article was so altered as to add thereto, the following, viz.: "the manufacture of ice, fertilizers and chemicals." Act 32 of 1886.

In Shreveport Gas, Electric Light and Power Company vs. Assessor, 47th Ann. 65, we had this constitutional amendment under consideration, and in the course of our opinion, we said:

"The words and terms of a constitutional article, like those of a law,

State vs. American Sugar Refining Company.

are to be understood in their most usual signification; and, in order to ascertain the true meaning of a statute, the reason and spirit of it should be considered, and also, the cause which superinduced its enactment.

"This is the accepted canon of construction of statutes, and equally so of the Constitution."

Accepting this as the proper view to be taken of the constitutional article and its amendment, the claim of the defendant to exemption from the payment of the licenses demanded, is wholly groundless for the very plain reason, that the manufacturer of sugar and molasses—if indeed it be such—is not mentioned in either; and, as it is the universal rule that questions of tax exemption must be strictly construed, judgment must go against the claim of the defendant.

There is, however, a doubt in our minds as to whether the law authorizes the State to recover on rule, licenses for any year anterior to 1897.

We will, therefore, give judgment for the sum of thirty-five hundred dollars, with two per cent per month interest from the 1st of March, 1897, and ten per cent. attorney's fees on said amount, and interest, and enter a non-suit as to the remainder of the plaintiff's claim.

It is therefore ordered and decreed that the judgment discharging the plaintiff's rule be avoided and reversed; and, it is further ordered and decreed, that the plaintiff do have and recover from the defendant, the sum of thirty-five hundred dollars, with two *per cent* interest per month thereon from the 1st day of March, 1897—ten *per cent* attorney's fees on said amount and interest.

It is further ordered, that a non-suit be entered on the balance of the claim, and that all costs of both courts be taxed against the defendant and appellee.

NICHOLLS, C. J., absent.

## ON REHEARING.

WATKINS, J. Having in our original opinion treated the defendant's exemption from the payment of a State license, as having been asserted under the provisions of Article Two Hundred and Seven of the Constitution of 1879, whereas the exemption was actually alleged and claimed under the provisions of Article Two Hundred and Six thereof, we granted a rehearing of this cause.

Recognizing this error to the defendant's prejudice, we now with-draw that portion of our opinion and will examine the claim of the defendant to exemption under Article Two Hundred and Six, of that Constitution.

That article is couched in the following words, viz.:

"All persons, associations of persons and corporations pursuing any trade, profession, business, or calling, may be rendered liable to such tax, *except* clerks, laborers, clergymen, school teachers, those engaged in mechanical, agricultural, horticultural, and mining pursuits, and *manufacturers*, other than those of distilled alcoholic or malt liquors, tobacco and cigars, and cotton seed oil. No political corporation shall impose a greater license tax than is imposed by the General Assembly for State purposes."

Under the provisions of this article, any manfuacturer is exempted from license tax unless he be a manufacturer of liquor, tobacco, cigars and cotton seed oil.

Hence, the answer claimed the exemption granted to all manu-facturers not included in the exceptions just mentioned.

For the purpose of laying a foundation for its exemption, the defendant interrogated its superintent as a witness, and from his testimony we have made the following extracts, viz.:

"Q.—Mr. McFetteridge, you are the superintendent of the American Sugar Refining Company of this city, are you not?

"A.—Yes, sir.

"Q.—What has been your experience in the refining of sugar?

"A.—I have had experience running over fifteen years in the North, and the past year in Louisiana.

"Q.—Now, you will please commence from the beginning and go through the whole process by which crude sugars are converted into refined sugar, and do so deliberately, and in making the explanation, exhibit the samples to the court and the pictures of the machinery and explain the operation?

"A.—Well, necessarily, some of the samples and the photographs to make a thorough explanation, will have to be shown together. Now, to begin with the process in the refinery; we receive the sugar either from plantations in the State, or from abroad, wherever produced, in barrels, or bags, packages, in whatever way it may be packed. Our first process is to melt every bag or barrel of sugar so received in suit-

able vessels, specially constructed for the purposes of melting sugar,. and bringing it to a tendency for refining.

"There are suitable storage apparatus—storage apparatus and steam. water storage, and they are connected with pumps run by power with. shafting, to pump the sugar after it is dissolved by these melters and conducting it to the upper stories of this building for another operation.

"Q.—Samples from No. 1 to No. 11 contain crude sugar and liquid: before you have done anything with it?

"A.—Yes, as we receive it. Sample No. 12 would show this crude· sugar melted before clarification and filtration.

"Q.—In the melter?

"A.—Yes, after it has been brought to the density we require it.

"Q.—Do you put all these sugars indiscriminately through the· melter?

"A.—It would not be my practice to put them in all, indiscriminately. It results better to follow high with low grades—although· they have to go through the same process.

＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊·

"Q.—I see a sample  No. 5, I should imagine—what is that?

"A.—That is what is called the third grade of raw sugar.

"Q.—Is this the most inferior grade of sugar that you receive?

"A.—Yes, I judge by looking at it, it is. We have some fourths, even poorer in quality than these thirds. After this sugar has been melted and pumped to the upper story of one of our buildings, we· conduct an operation that we call clarification. This is done in blow-ups, and I have an exhibit of these raw sugar blowups which is No. 25 of our exhibits.

x     ＊     .     .     ＊     ＊     ＊     .＊     ＊     ＊     x     ＊     ＊

"Q.—What is a blowup, and where is it on this vessel?

"A.—Here, iron tanks containing steam."

The Witness—"After leaving these blowups, the liquid is strained through these bags, the purpose being to remove the mechanical impurities—the insolulable impurities that exist in the liquid form of the sugar.

＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊     ＊·

"The process following this straining through the bags is the filter-

ing process through boneblack filters, which are iron vessels in our establishment about twenty feet in height and ten feet in diameter.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*.

"This speaks for itself. Now, I might speak of the process and show these samples in connection with this fluid. This liquid after it leaves the bag filters, is strained through the filters containing this burnt animal boneblack itself, and also, after the liquid leaves the boneblack. I have already shown the liquid after going in the bag filters. Sample No. 14 is a sample of this burnt animal boneblack. This is used as an agent for decoloring and removing impurities.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"No. 15 is an exhibit of this raw sugar after being melted, clarified in the blowups, strained through the filters, and decolorized by boneblack before boiling in vacuum pan.

By the Court—"Do you bring all the grades of sugar from the lowest to the highest to that condition?

"A.—Sir?

"Q.—Some of the other grades you have to filter more than once?

"A.—Yes, to bring it to this color. The next photograph we have deals with the machinery that is used for revivifying the boneblack that has been used for the purpose of filtration.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"Q.—Please state what you mean by revivifying?

"A.—This boneblack after being used for some length of time more or less dependent upon the condition of the sugar that is run through it, becomes exhausted, and unfit for further use, consequently, it is necessary by the application of a greater or lesser quantity of hot water to be run through these boneblack filters to thoroughly wash this boneblack, and after this is done the boneblack is brought back to a condition fit for use again, while the reburning of the boneblack in what are called boneblack kilns—

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"By Mr. Semmes—Under great heat?

"A.—Yes, sir.

"Q.—What degree?

"A.—Between seven and eight hundred.

"Q.—Fahrenheit?

"A.—Yes, sir.

By the Court—"What is boneblack; animal bones reduced to a black powder by being burned or charred?

"A.—Yes, sir; decidedly.

By Mr. Semmes:

"Q.—Made of bone?

"A.—Yes, sir; made of animal bones. I have omitted one important photograph in connection with the bag-filters that I wish to show. That is photograph No. 27, showing the scum press, in which the impurities that are collecting in the bag filters, are collected in this scum press and burned out of the house, and the object of the scum press is to recover whatever existing liquid may be in those impurities. Of course, taking the bag out of the bag filters mixes with sand. A certain amount of liquid is in there and we desire to recover the liquid, leaving the raw cake.

By the Court:

"Q.—How do you get all of that stuff out of the bags?

"A.—By washing the bag in a tub and pumping the residue of this stuff out, and it leaves the dry scum.

By Mr. Semmes:

"Q.—Have you a sample of the scum?

"A.—Yes, sir; sample No. 13 is a sample of this scum and mud that is taken from the sugar in this raw state, and finally thrown out as worthless, containing no more sugar, and as valueless.

"Q.—That comes out of the scum press.

"A.—Yes, sir. We exhibit this to show the amount of impurity and dirt that we recover in this way and that is taken from the sugar. I may say that frequently we take as many—depending, of course, on the amount of work we are doing—as seventy and eighty barrels of this dirt and scum daily, containing four hundred pounds to the barrel.

By the Court:

"What is done with that?

"A.—Carried away into waste. It has no value that we know of."

By Mr. Semmes:

"Q.—Wouldn't it be good as manure?

"A.—It might be, but we pay for removing it. We get no return for it. Photograph No. 30 is the vacuum pan. It is an exhibit of the first stage of manufacture, after this liquid has left the boneblack

filters. It is the vacuum pans of the refinery for the crystallizing of this filtered liquid into grains.

"Q.—What happens in the vacuum pans?

"A.—This filtered liquid is made into grains. The vacuum pan has a vessel shown here containing a series of coils, and the steam is turned on the pans.

"Q.—Boiled in a vacuum?

"A.—Yes, sir; at a low temperature. That is one of the operations of the refinery in which a good deal of skill is required in filling this grain with liquid from time to time, and until finally the pan is finished.

"Q.—What do you call it, 'finishing pan?'

"A.—Yes, sir; we term it a strike.

By the Court:

"Q.—Does the grain form in the pan?

"A.—Yes, sir.

"Q.—In the pan?

"A.—Yes, sir; in the pan itself. I will show you. Photograph No. 30 shows the vacuum pan itself. This is a sample, No. 16, in our exhibits of the magma.

"Q.—That is what you term this sugar at that stage in the process of refining?

"A.—Yes, sir; after boiling in the vacuum pan, it is in that condition when it is dropped in the vacuum pan for the next stage of manufacture.

"Q.—Before going into the centrifugals?

"A.—Yes, sir; that, as I said before, requires a great deal of skill in the handling.

"Q.—That is what might be called a wet refined sugar?

"A.—Yes, sir.

"Q.—The next process is to dry it?

"A.—Yes, sir; but the grain is already perfectly formed here in the vacuum pan. The next exhibit and the next stage of manufacture is shown by our photographs marked No. 31, showing the centrifugal machines, shafting, pulleys, beltings, etc.

"Q.—What is the function of the centrifugal?

"A.—The function is to remove this magma after it leaves the pan and separate the grain and moisture, leaving the dry sugar.

"Q.—The syrup goes out in one direction and the sugar dried remains in the machine?

"A.—Yes, sir. Here is an exhibit of the sugar from the machine, showing the contrast between the sugar leaving the vacuum pans and the sugar after being machined in the centrifugal. Our first photograph is marked No. 32, and it is a view of our cube or block sugar machines, showing the machine by which the sugar is pressed into these cubes, as shown in sample marked No. 19. The sugar from the centrifugal machines comes into this cube machine, and by a system of pressing is pressed into these cubes. The sugar is pressed in those by an application of hot air for a certain number of hours, and is perfectly dry, as shown by the form shown. Exhibit No. 33 is a photograph of the granulation machine, and sample marked 21 is an exhibit of sugar after being thus granulated in these granulating machines. The machine is simply a cylinder drum. This extends six feet in diameter and twenty-five feet long, and by the force of hot air being forced through at a great rapidity, through these drums, and the drum being kept in motion, the sugar is thoroughly dried, of any moisture remaining in it after leaving the centrifugal machine, and becomes a finished product with an attractive appearance, such as shown in this sample, No. 21, which is a sample of finished granulated sugar.

"Q.—It is merely a drying machine?

"A.—This is the drying machine. We have to conduct an operation for making crystals in the vacuum pans.

"Q.—The main function of that apparatus is to finish the drying process?

"A.—Yes, sir; and make the grains more sparkling—more handsome in appearance for table sugar.

"Q.—It is what you might call a polishing machine, is it?

"A.—Yes, sir; sparkles.

\* \* \* \* \* \* \* \*

By the court:

"The next exhibit is photograph marked 34, showing our powder mills for making a special grade of sugar known to the trade as powdered sugar, which is considered the finest grades of crystalized sugar used by confectioners for crystallizing fruits, etc. This is a sample of the pulverizing press. It goes through (13) discs revolving at a great rapidity, shown in this photograph No. 34, completely pulveriz-

ing the grain and leaving the product as shown in the sample marked No. 20 powdered sugar.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

By Mr. Semmes:

"Q.—Is that after granulation?

"A.—Yes, sir; after leaving the granulation it is completed into powder and there is absolutely no moisture left in the sugar, and both of these grades of sugars, granulated and powdered, undergo all these operations as I described it. I have forgotten again to show one sample taken without a photograph. It is sample No. 18, which exhibits a sample of the syrup coming from the centrifugal machines. While drying the sugar in these machines, this fluid is drawn from perfections or sieves in the machines, and runs into tanks, where it is again pumped to the pans and taken in for boiling again through a number of skillful stages.

By Mr. Semmes:

"Q.—That No. 18 is the moist sugar that comes from the centrifugal?

"A.—It has water and syrup between the grains of sugar as it comes through the vacuum pans, and is thrown out as it goes through the sieves of the centrifugal. Sample No. 22 is a grade of sugar manufactured by us known as confectioners' A, in which the operation of granulating is omitted, and the grain is formed in the vacuum pans to the size desired by the trade, after the operation of machining in the centrifugal is, of course, conducted, but after leaving that, it is packed in barrels for shipment, and afterwards retained some little moisture.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

By Mr. Semmes:

"Q.—How do the confectioners use that sugar?

"A.—They use it in their confections. I am not familiar with that.

"Q.—For what reason is that sugar manufactured?

"A.—It is to satisfy the trade. Eventually, they get better results out of this sugar.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"No. 36 and No. 37 is a photograph of the apparatus called the Lily evaporator. Its object being to bring to a greater degree of density the liquid resulting in sweet water and such as comes from the wash-

ing of the tubs and boneblack apparatus, by which the liquid is drawn from the tubes and through which steam is passed, and thickened up to the required density.

"Q.—This is the residue after refining?

"A.—Yes, sir; molasses, which is also a product of a refinery. I think I have exhibited all the manufactured samples in detail and the raw material from which we manufacture, which are all here as exhibits.

By the court:

"Q.—During what process in the stage of refining do you get this molasses?

"A.—This molasses that we produce?

"Q.—Yes.

"A.—No. 33 is a sample. Here it is. We get it as the full final stage of the process. It is simply a substance containing sugar, but mixed with it are impurities that have been taken out at other stages of refining to such an extent, as would prevent this from being turned out as granulated sugar.

"Q.—Where does that come from? The final stage?

"A.—In the process of crystallizing. Finally—throwing off syrups from time to time, we finally get to the stage where we can not boil it into grain, as it would not be profitable for the refinery to attempt to extract the sugar in this molasses; it would not justify us to go to the expense of obtaining the sugar remaining in it from it. I think I have described the process."

Analyzing this testimony we find that the process of refining sugar, by the defendant company, is conducted in the following manner, substantially, viz.:

The sugar is received from the plantations where it is first manufactured, or from abroad, in barrels, bags, or packages in which it has been packed; and the first process, after it has been received, is to put it in vessels specially constructed for the purpose, and melt it, and bring it to a tendency for refining.

This is done through the instrumentality of large vessels called "melters."

The next process is that of "clarification," which is done by means of what are technically styled "blowups," large wide tanks containing steam; and the liquid is strained through bags, after leaving the

blow-ups, for the purpose of removing any insoluble impurities which exist therein.

Then follows the "filtering" process through large bone-black filters, that is, filters containing "burnt animal bone-black;" and it is used for the purpose of "decoloring and removing impurities" from the liquid.

The testimony of the superintendent explains the effect of the foregoing processes upon the raw, or unrefined sugar, to be as follows, viz.:

"We exhibit this to show the amount of the impurity and dirt that " we recover in this way, and that it is taken from the sugar. I may " say that we frequently take as many—depending, of course, on the " amount of work we are doing—as seventy or eighty barrels of this " dirt and scum daily, containing four hundred pounds to the barrel."

The next is the "granulating" process, which is conducted by depositing into vacuum pans, wherein the liquid is crystallized into grains; which is accomplished by means of a series of coils of pipe through which the steam is conveyed into the vacuum pan at a low temperature.

Of this process the testimony of the superintendent speaks as follows, viz.:

"That is one of the operations of this refinery in which a good deal " of skill is required in filling this grain with liquid from time to " time, and until finally the pan is finished."

This is called the "finishing-pan," and the drying process is technically termed a "strike;" and that is because the liquid becomes granulated by this process—the grains forming, in the pan. In that condition it is called "wet refined sugar."

The next process is drying the sugar thus granulated by passing it through centrifugal machines, which is described by the superintendent thus:

"The function (of the centrifugal) is to remove the magma after it " leaves the pan, and separate the grain and moisture, leaving the dry " sugar."

The sugar passes from the centrifugal machines into what is termed a cube-machine, the sugar being pressed into cubes by the application of heated air, and is made perfectly dry.

The superintendent thus describes the process, viz:

"The machine is simply a cylinder drum. This extends six feet in

37

"diameter and twenty-five feet in length; and by the force of hot air being passed with great rapidity, through these drums, and the drums being kept in motion, the sugar is thoroughly dried of any moisture remaining in it after leaving the centrifugal machine, and becomes a finished product with an attractive appearance. such as is shown in the sample No. 21, which is a sample of the finished granulated sugar."

The witness then describes the process of making "a grade of sugar known to the trade as powdered sugar," which is considered to be one of the finest grades of sugar, and chiefly used by confectioners for crystallizing fruits, etc.—but this needs no special attention, as it plays no part in this controversy—and the same may be said of the syrup which comes from the centrifugal machines during the process of granulating sugar.

The latter process is described by the witness in this way, viz: "The moist sugar that comes from the centrifugals has water and syrup between the grains, as it comes through the vacuum pans, and is thrown out as it goes through the sieves of the centrifugals."

Again, the superintendent says that the syrup is the final process of crystallization, in which it is thrown off from time to time; that "we finally get to the stage where we can not boil it into grain, as it would not be profitable for the refinery to attempt to extract the sugar in this molasses," etc.

On this state of facts, is the defendant a *manufacturer* in the sense and within the meaning of Article two hundred and six of the Constitution of 1879?

Before expressing an opinion on that question, we will examine the adjudications of this court in which it has placed an interpretation upon that article, and defined the term *manufacturer* as applied to different industries and pursuits which were under investigation therein, so that we may the better draw the analogy between them.

In City vs. LeBlanc, 34th Ann. 597, this court said: "A manufacturer is not one who creates out of nothing, for that would surpass human power; neither is he one who produces a new article out of materials entirely raw.

"He is one who gives new shapes, new qualities, new combinations to matter which has already gone through some artificial process.

"A shoemaker is none the less a manufacturer because he does not tan the leather; the tanner is none the less a manufacturer of

" leather, because he does not breed and raise the bullocks from which
" the raw hides are taken.   The tanner makes leather to sell, but he
" does not buy the hides to sell again.

"He produces the article of leather, and depends upon the labor
" which he bestows upon the raw material."   The court sustained the
defendant's exemption from the payment of a license, on the ground,
that his occupation was that of a cooper, and made barrels and hogs-
heads from rough logs and splits, etc.

In City vs. Ernst & Co., 35th Ann. 746, the court sustained the de-
fendants' exemption as a rice-miller, and in so doing, employed this
language, viz:

"A manufacturer is defined to be, one who is engaged in the busi-
" ness of working raw materials into wares suitable for use; who gives
" new shapes, new qualities, new combinations to matter, which has
" already gone through some artificial process.

"A manufacturer prepares the original substance for use in differ-
" ent forms.   He makes to sell, and depending for his profit on the
" labor which he bestows on the raw material.

"Rice is an agricultural product, extensively raised in this State.
" The milling of it is effected by different processes, during which it
" passes from its original roughness to conditions in which it is fit
" for different uses.

"Deprived of its outer shell, and of the silica enveloping the de-
" nuded grain, it becomes an object of marketable value.   It is only
" after several manipulations that various substances or products are
" obtained, which are, the hull, the bran, the flour, the red grain, and,
" finally, the cleaned and polished kernel—all of which become separ-
" ate and distinct articles of commerce.

"It is not easy to distinguish between the several processes to which
" rice is subjected by the manufacturer, who, from beginning to end,
" works it up into various forms for use.   It may be said to undergo
" one and the same process throughout.   Even if a distinction could
" be realized, the working of the raw material is accomplished contin-
" uously.   The person who puts it through the process gives to it
" gradually new shapes, new qualities, new combinations; and thus is
" a manufacturer within the intent and scope, the spirit and letter of
" the constitutional immunity."

In State vs. Dupre & Hearsey, 42 Ann. 561, the court maintained
the defendants' exemption from the payment of a license, pursuing

the business of editing, printing and publishing a daily newspaper, and the court, after making the foregoing quotation from State vs. LeBlanc, used this language, viz:

"Keeping this definition in view, the statement of facts embodied " in this record shows, that defendants' use in their business, valuable " machinery and implements; that, in addition to the clerical and " editorial departments, they employ a large number of mechanical " laborers, such as type-setters, engineers, pressmen, and their assist- " ants; that they purchase and use great quantities of raw materials, " such as paper, ink, glue, etc.; that by means of this machinery and " mechanical labor, they convert this raw material into a new and dis- " tinct article for use and in commercial demand called a newspaper, " which they sell directly to dealers and consumers."

But this court placed its decision principally upon the grounds (1) that the provisions of the license law of that year did not, in terms, embrace the defendants' business; (2) that the publishing of books, and the manufacture of stationery being expressly exempt under ar- ticle two hundred and seven, by fair analogy like exemption should be extended to a newspaper under article two hundred and six of the Constitution.

Hence that decision is somewhat *sui generis* and exceptional, and can not be accepted as generally applicable as a precedent.

In State vs. Biscuit Manufacturing Company, 47th Ann. 160, this court maintained the exemption of the defendant as a manufacturer of crackers, biscuit and Italian paste, the proof disclosing, that the " process of manufacture is, that the flour leaves the barrels and " passes through a powder-sifter, thence into a powder-mixer, from " this into a dough-box on tracks, and is worked into two different " kinds of dough; goes into a cutting machine, and finally into the " oven, from which the complete articles are taken, boxed and shipped. " The material is handled exclusively by machinery."

Upon this statement, the court say: "It will be perceived, that the "establishment is a manufactory in which raw materials are made "into wares suitable for use. There are new shapes, new combina- "tions, new qualities given to the raw material by the process of man- "ufacturing the articles from the original material."

After citing other cases and distinguishing them therefrom, the court concluded its opinion as follows, viz.:

"In the instant case, the identity of the original material is lost in

"the new articles created in the change of shape, new qualities and "new combinations which enter into their composition, which render "them suitable for use in an entirely different manner from the man- "ner in which the original material could be used."

In Fertilizing Company vs. Assessor, 48 Ann., 1476, we held that a process resulting in vaporizing the moisture in offal and animal mat- ter, disposing of the grease, separating the grease or oils of such refuse matter, and converting the *residuum* into a fertilizer, is the manufacture of such fertilizers within the scope of the Constitution.

The foregoing are the cases in this court on which the defendant relies for the maintenance of its exemption.

In State vs. Homard, 23 Ann., 263, the defendant claimed exemp- tion from the payment of a license as the proprietor of a cotton-press, because he employed the cotton pickery exclusively for his own use; and that as a commission merchant, he was accustomed to purchase wet, damaged and muddy cotton, and clean and prepare same for market in his cotton pickery, and sell it for his own account.

The District Court rejected his claim, and this court affirmed the judgment.

In State vs. Mannessier, 32nd Ann., 1075, the defendant appealed from a judgment condemning him to pay a license as a peddler of ice- cream, and made claim to exemption on the ground that he made sales exclusively of articles of his own manufacture; and this court denied the exemption.

In State vs. Eckendorf, 46 Ann., 131, we held that a baker who makes and sells his own bread exclusively, is not entitled to exemption from the payment of a license as a manufacturer of bread; the proof disclosing "that bread is made from flour, the dough being prepared "with yeast and salt, and required an experienced hand to bake it "properly."

In Patterson vs. City, 47th Ann., 276, we find some very pertinent and controlling expressions of this court with regard to the import and meaning of the term *manufacture* as it is employed in the Con- stitution, notwithstanding our opinion dealt with the exemption in article two hundred and seven.

We said:

"The Constitution uses the word manufacture in its ordinary "sense. Its natural import is to produce an article; and its common

"application refers to changing the raw material into some new and "useful form."

And in speaking of the exemptions which are contained in article two hundred and seven, our opinion says: "In all these exemptions "the Constitution contemplates manufactories that *produce an article,* "*not a mere addition, or mode of use of an article already manu-* "*factured.*"

In City vs. Coffee Company, 46 Ann., 86, the defendant claimed exemption as a manufacturer of coffee, and the same was sustained by the lower court, but this court reversed its judgment, and in the course of their opinion, said:

"The defendant corporation contends that by means of a secret, "non-patented process, it is enabled to make a selection of green coffee "having the qualities required for the purpose intended, which coffee, "after being subjected to manipulation, being roasted and allowed to "cool in a particular manner, produces certain brands of coffee, each "having a recognizable taste and flavor.

"The defendant corporation says, and insists, that no chemicals of "any kind are used during the secret process, and it is upon the pro- "duction of its different brands of roasted coffee that it relies to be "held to be 'a manufacturer of coffee.'"

The court then observed that, "we are satisfied that the defendant "corporation does not claim that it is a manufacturer by reason of "grinding coffee and thereby changing its form," but that, on the contrary, "its claim to be a manufacturer of coffee is based wholly on "the production of brands of unground, roasted, coffee."

The opinion then cites, with approval, the following extract from Hartranft vs. Wiegmann, 121 U. S., 609, viz.:

"We are of opinion that the shells in question, here, were not man- "ufactured, and (complainants) were not manufacturers of shells. "* * * They were still shells. They had not been manufactured "into a new and different article having a distinctive name, character, "or use from that of a shell. The application of labor to an article, "either by hand, or by mechanism, does not make the article neces- "sarily a manufactured article, within the meaning of that term as "used in the tariff laws. Washing and scouring wool does not make "the result a manufacture of wool. Cleansing and ginning cotton, "does not make the result a manufacture of cotton."

The court, in the principal case, then said:

"It is not every employment of labor which will make the thing upon "which it is employed, a manufacture. It has been held that the "great and laborious pursuits of mining and ship-building, are not "manufacturing occupations."

And upon the foregoing five cases, counsel for the plaintiff relies as well as upon those cited by the defendant's counsel.

This *resume* embraces extracts from all the pertinent decisions of this court with regard to the terms *manufacturer* and *manufacture,* as they are employed in the exemption articles of the Constitution; and we propose to add thereto a few extracts from the decisions of the courts of other jurisdictions, so as to make a complete *consensus* of judicial opinion on the question at issue.

The following cases are cited by the defendant's counsel in their brief, viz.:

"In the case of the United States vs. Sommer, 41 Fed. Rep., 327, the "court, after stating that when certain materials found in nature are "placed in a melting pot, the substance produced is crude glass, pro-"ceeds thus: 'It is a manufacture. The component materials are "transformed into new substance. Now that same glass may be, by "the application of labor, transformed from the molten state, by a "process of blowing and cutting, into an article which is known as "cylinder or window glass, which is a manufacture of glass, because "it is of a distinctive character, and has a distinctive name, and a "distinctive use from the crude glass out of which it is made. And "so, by a different process of manufacture, this same crude glass when "poured upon a table and pressed with a roller, becomes what is known "in trade and commerce as rough or rolled cast plate glass. That "also is a manufacture of glass. That also has a use, character, or "name, distinct from the use, character, or name, of the crude glass in "the crucible out of which it is made. By various processes, and by "the application of a great deal of labor, this rough or rolled plate "glass is eventually transformed into polished plate glass. It needs "no witness to tell us that polished plate is a manufacture of glass, "within the definition of the Supreme Court, and, therefore, a manu-"facture of glass."

Similar views are expressed by the Supreme Court of the United States in the recent case of Tide Water Oil Company vs. United States, 171 U. S. Rep., 216.

In that case the court said:

"The primary meaning of the word 'manufacture' is something "made by hand, as distinguished from a natural growth; but as "machinery has largely supplanted this primitive method, the word "is now ordinarily used to denote an article upon the material of "which labor has been expended to make the finished product. "Ordinarily the article so manufactured takes a different form, or at "least subserves a different purpose from the original materials; and "usually it is given a different name. Raw materials may be, and "often are, subjected· to successive processes of manufacture, each "one of which is complete in itself, but several of which may be "required to make the final product. Thus, logs are first manufact-"ured into boards, planks, joists, scantlings, etc.; and then, by entirely "different processes, are fashioned into boxes, furniture, doors, win-"dows, sashes, trimmings, and the thousand and one articles manu-"factured wholly or in part of wood. The steel spring of a watch is "made ultimately from iron ore, but by a large number of processes, "or transformations, each successive step in which is a distinct pro-"cess of manufacture, and for which the article so manufactured "receives a different name."

The following are the cases cited by the plaintiff's counsel in their brief, viz.:

"Thus in Rex vs. Tregoning, 2 Young & Jervis Reports, 132, "where "a printer of calicoes was held not to be a manufacturer, it was said: " 'It is contended that, for the purpose of this act, the printer is the "maker and manufacturer of these goods, likening this, as I conceive, "to the familiar case of the maker of a picture who is, of course, he "who spreads the colors upon the canvas which produce the impres-"sion upon the mind, and not the man upon whose canvas the picture "is printed. There is, however, no resemblance whatever between the "two cases. The maker and manufacturer of these goods, according "to the plain sense and common understanding of these words, is he "who manufactures the articles upon which the print is impressed. "He who puts the stamp upon the goods is not the maker or manu-"facturer within the common meaning of these words, upon the plain "construction of which I have no doubt.' "

Again:

"In Frazee vs. Maffit, 20 Blatchf. (U. S.), 267, it was held that a "process of baling hay was not a manufacturing process, and the court "said, among other things: 'Dried apples would not be called a manu-

"factured article, though the apple is peeled and cored, and sliced, "and dried by exposure to the sun and *manipulation;* the substance of "dried apples is still apples. *Change of name and manipulation* does "not necessarily constitute manufacture under the meaning of Sec-"tion 2516.' "

"Thus it was held in Commonwealth vs. Glitinam, 64 Pa., St. 100: " 'The rectifying process is not a manufacturing process. Webster "says it means correcting, amending, refining by distillation; subli-"mation, adjusting. Rectifying distilled spirits made in another "State does not constitute it spirituous liquors manufactured within "this commonwealth. The spirits were not manufactured here; they "were only corrected or refined in this commonwealth.' "

In United States vs. Tenbrook, Pet. (C. C.), 180: " 'The use of a "still for rectifying spirits *already distilled* is not the distilling of "spirits within the meaning of an internal revenue act, nor in the "common understanding of mankind.' "

"And affirming the case on appeal, United States vs. Tenbrook, 2 Wheat., 247:

" 'The rectification or purification of spirits after their distillation "has been complete, in order to fit them for certain purposes of com-"bination with other materials, is no part of the process of distilla-"tion. The distillation of spirits and the rectification of them after "they are distilled appear to be separate and distinct acts.' "

Considering these various expressions of opinion with regard to the term *manufacturer,* what is the proper conclusion to arrive at in respect to the defendants employment?

This court said that a cooper who makes barrels and hogsheads from rough logs and splits of wood is a manufacturer, because he gave new shapes, new qualities, and new combinations to matter which had already gone through some artificial process. It held that a rice-miller is a manufacturer because he works raw materials into wares suitable for use, and makes from the denuded grain, after several manipulations, various commercial products and substances, such as bran, flour, red grain, and the polished kernel.

It held a corporation which made crackers, biscuit and Italian paste from flour, to be a manufacturer, because the raw materials were made into wares suitable for use; new qualities being given to the raw materials by various manufacturing processes, whereby the identity of the raw material was lost.

That the process by which the moisture in offal and animal matter is vaporized, and the grease and oil separated therefrom, and the *residuum* converted into fertilizers, is a manufacturing process.

But it has held that one who purchases wet, muddy, and damaged cotton, and cleans and prepares same for sale, is not a manufacturer, because cleaning and ginning cotton do not make the result the manufacture of cotton.

That one who makes ice-cream from sugar, ice, milk, and other ingredients, is not a manufacturer.

That one who makes bread from flour, salt and other ingredients, is not a manufacturer.

That the natural import of the term manufacture is to produce an article by changing the raw material into some new and useful form; and that to produce an article is not a mere addition, or mode of use of an article already manufactured.

That a corporation which, by a secret non-patented process, is enabled to make a selection of green coffee, possessing the requisite qualities for an intended purpose, after having been subjected to certain manipulations, is not a manufacturer.

That one who, by the application of labor and mechanical skill, makes certain kinds of shells more polished, and attractive in appearance, is not a manufacturer, because he did not manufacture them into new and different articles, having a distinctive name, character, or use, from that of shells; for they remained shells still.

That the washing and scouring of wool does not make the result a manufacture of wool.

That mining and ship-building are not manufacturing occupations.

That the printer of calicoes is not a manufacturer, because he does not make the goods, only prints the colors upon them, and improves their salable value; unlike the painter who, with his brush, spreads colors upon a canvass, and thereby *creates* a work of art which produces a pleasing impression upon the mind, and captivates the fancy of the beholder.

The result of the evidence as applied to the authorities, in our opinion, is that the process of refining sugar and molasses, as it is explained by the defendant's superintendent, is not a manufacturing process, and that defendant is not a manufacturer in the general and common acceptation of that term.

At its incipiency the defendant purchases on the market, or from

planters, a supply of *sugar* in a completely manufactured state, and, by skillful manipulations, through the instrumentality of vast, elaborate, and complicated machinery, and by an application thereto of steam-power, and great air pressure, same is first melted, then cleansed of its impurities, then bleached and improved in color, then dried, granulated, and brought into *sugar* again—in exactly the same state it was when these manipulations were commenced, though greatly improved in purity and beauty of appearance and rendered more merchantable.

By this process *sugar* is refined in grade, improved in quality, and bettered for commercial use, but it remains *sugar* still, like the cotton and the shells.

It is given no new name, use, shape, or combination.

It is the self-same, identical, raw material, just as when first manufactured from the cane, and marketed by the planter.

Tax exemptions are strictly construed, and can not be sustained except upon clear proof. Doubt is fatal to the claim.

## IV.

In our former opinion we said: "There is, however, a doubt in our "minds as to whether the law authorizes the State to recover on rule, "licenses, for any year anterior to 1897;" and, consequently, gave judgment only for the sum of $3,500, as the amount of the license due by the defendant for the year 1897, with two *per cent.* per month interest from the 1st of March, 1897, and ten *per cent.* attorney's fees.

When, however, we granted a rehearing, that opinion was set aside, and the whole controversy set at large, again; and, on the resubmission of the case, the counsel of both parties gave this question their attention in their briefs.

We make the following quotation from the application of the defendant's counsel for a rehearing, viz.:

"Third—Under these circumstances, we submit that the most sat- "isfactory course to pursue is, that the court grant a rehearing and "set the cause again for argument, as if it had never been considered, "and that an oral argument be allowed on the rehearing. An oral "argument is preferable because the case is reduced to one of fact— "that is to say, whether the defendant company is a manufacturer of "sugar or not; so that the oral argument can be confined by the court "to the question of fact, and thus save consumption of time.

"This case is important, when the amount involved is considered, "because, if decided against the defendant, *it will be compelled to pay* "*the city license for the years claimed by the State in this suit with* "*penalties and the excessive interest of the two per cent. per month;* "and in addition thereto, the defendant becomes liable to pay the "licenses, both State and city, for the year 1898, with similar penalties; "to say nothing of the claim of the State to institute a new suit for the "licenses of the years disallowed in this proceeding because of the form "of action, including the penalties for a delinquency, which was unintentional, because the defendant supposed it was exempt."   (Our italics.

Counsel for the State cites the provisions of the license law of 1890, as follows, viz.: "That if any business shall be conducted without a license   *   *   *   the officer whose duty it is to issue licenses, shall, through the attorney herein provided for, on motion in the proper courts,   *   *   *   take a rule on the party, or parties doing such business, to show cause   *   *   *   why said party or parties should not pay the amount of the license claimed and penalties, or be ordered to cease from further pursuit of said business until after having obtained a license, etc."   Section 18 of Act 150 of 1890.

Counsel cites the case of McGuire, Tax Collector, vs. Vogh, 36 An. 812, in which this court placed the following interpretation on a similar statute of 1880, viz.:

"A license could not be collected by sale of an occupation, and it is upon an occupation that the license is imposed. For that reason, doubtless, a *rule* is authorized to be taken on motion against the party who has not obtained his license, to show cause why he shall not stop his business, (Acts of 1880, p. 152); and we see no reason why the rule should not, also, embrace the collection of the license, although it is not prescribed as the mode of collecting licenses, etc."

But the legislature of 1886, doubtless recognizing the propriety of the court's suggestion in the Vogh case, amended the license law in that respect, so as to conform thereto.   Sec. 17, Act 101 of 1886.   And Section 18 of Act 150 of 1890, is an exact reproduction thereof.

In State *ex rel.* Pacquet vs. Judge, 49 An. 764, this court construed and enforced the statute in question—Section 18 of Act 150 of 1890.

In State vs. Insurance Co., 43 Ann. 133, this court enforced the provisions of Act 101 of 1886.

In City vs. Insurance Co. 41 Ann. 1143, the plaintiff proceeded by

rule under the Act of 1886, to enforce the payment by the defendant of licenses for the *two years,* 1887 and 1888; and this court sustained the proceeding and amended the judgment appealed from so as to give judgment for the two *per cent* per month interest allowed by that act —same being similar in that respect to the statute of 1890.

The foregoing decisions, and the statutes they refer to, have resolved the doubt we entertained with regard to proceeding by rule for the recovery of the delinquent licenses, in favor of the State, for the years prior to 1897; and for that reason, we are of the opinion, that the State is entitled to recover judgment against the defendant and appellee for the amount of the annual license for each of the years in which the petition charges its delinquency—that is to say, for the sum of $3,500 for each of the years 1892, 1893, 1894, 1895, 1896 and 1897, with interest and attorney's fees and cost.

It is therefore ordered and decreed, that our former judgment and decree be annulled and set aside; and it is further ordered and decreed that the judgment appealed from be, likewise, annulled and reversed. And proceeding to render such judgment as should have been rendered by the judge *a quo,* it is adjudged and decreed, that the State of Louisiana do have and recover of and from the American Sugar Refining Company, defendant and appellee, the sum of three thousand, five hundred dollars, for each and every one of the years 1892, 1893, 1894, 1895, 1896 and 1897, with two *per cent.* per month interest upon each of said respective amounts from the first day of March of each one of said years, respectively, and ten *per cent.* upon the aggregate amount of said several sums, capital and interest, as attorney's fees; and all costs of both courts.

The right to apply for rehearing is reserved to both parties.

NOTE—This case has been taken to the Supreme Court of the United States by writ of error.